JDN

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rex Jeffrey Walls, | ) No. CV 05-2259-PHX-NVW |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| Dora B. Schriro, et al., | ) |
| Defendants. | ) |

Plaintiff Rex Jeffrey Walls brought this civil rights action under 42 U.S.C. § 1983 against various officials from the Arizona Department of Corrections (ADC): ADC Director Schriro; Sr. Chaplains Henderson and Becker; Chaplains Mason and Powers; Deputy Warden Kimble; and Correctional Officers (CO) Curran, Beginski, and Sauceda (Doc. #7).[1] Before the Court are the parties' cross-motions for summary judgment (Docs. #189, 194, 197).

The Court will grant summary judgment for Plaintiff on one claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* (RLUIPA), and issue a permanent injunction allowing Plaintiff to wear his religious hairstyle. Summary judgment will be granted against Plaintiff on all other claims.

---

[1] Upon screening, the Court dismissed ten Defendants (Doc. #11). Two other Defendants—Wilber and Smith—were dismissed voluntarily and on summary judgment respectively (Doc. #97). And McVicker, Ireland, and Sabbah were dismissed for failure to serve (Doc. #100).

## I.    Background

### A.    First Amended Complaint

Plaintiff's action concerns his religious exercise rights as a member of the Hare Krishna faith.  In Count I of his First Amended Complaint, Plaintiff alleged that he was denied a proper religious diet (Doc. #7 at 4).  He asserted that his meals must be handled only by Hare Krishna devotees (id.).  Count II alleged that Defendants denied Plaintiff a religious hairstyle in accordance with the Hare Krishna faith (id. at 5).[2]  The Court granted Plaintiff's subsequent request for a preliminary injunction permitting him to wear the religious hairstyle called a sikha—a shaved head except for a lock of hair at the base of the skull (Doc. #97).[3] And in Count III, Plaintiff claimed that Defendants denied him religious services and visitations (Doc. #7 at 6).  In each count, Plaintiff alleged that Defendants' actions violated (1) his RLUIPA rights, (2) his First Amendment free exercise rights, and (3) his Fourteenth Amendment equal protection rights (see Doc. #11).

### B.    Defendants' First Motion for Summary Judgment

Defendants moved for summary judgment on the RLUIPA claims within each count (Doc. #158).  The Court granted the motion in part and denied it in part; the RLUIPA claim in Count III was dismissed, as well as the RLUIPA claims for damages within Counts I and II on qualified immunity grounds (Doc. #185).  The remaining claims were the First and Fourteenth Amendment claims within all three counts and the RLUIPA claims for declaratory and injunctive relief in Counts I and II (id.).

After Defendants filed their Motion for Summary Judgment, new Ninth Circuit case law was issued relevant to Plaintiff's claims and the applicable evidentiary standards. Therefore, the Court set a new dispositive-motions deadline (id. at 23).  Each party filed a summary judgment motion.

---

[2] The Court dismissed those claims in Count II that concerned the possession of certain religious items because Plaintiff failed to exhaust administrative remedies (Doc. #42). The claim within Count II regarding the religious hairstyle was reinstated by the Court (Doc. #97).

[3] This injunctive relief remains in effect pending the relief granted in this Order (Docs. #97, 125).

### C.   Plaintiff's Motion for Summary Judgment

Plaintiff argues that under <u>Warsoldier v. Woodford</u>, 418 F.3d 989, 998-1000 (9th Cir. 2005), he is entitled to summary judgment on his religious diet claim (Count I) and his religious hairstyle claim (Count II) (Doc. #189).  Plaintiff contends that there is no evidence that a Hare Krishna diet would affect prison security and discipline or upset institutional operation and costs (<u>id.</u> at 2).  He further contends that despite wearing his Hare Krishna hairstyle for over a year, there is no evidence that he has been threatened or in any danger, including when he was temporarily confined at the Maricopa County Jail where known gang members are housed (<u>id.</u> at 1-2).  Plaintiff states that gang activity is not a factor in his current housing unit, and he notes that Defendants have already exempted an Orthodox Jewish inmate from the grooming policy (<u>id.</u> at 2).

Defendants respond and cross-move for summary judgment on Count II (Doc. #197).[4] They argue that because Plaintiff has failed to establish or even allege that he has a sincerely held belief that a sikha hairstyle is *necessary* for him to exercise his Hare Krishna faith, he has failed to state a claim under the First Amendment (<u>id.</u>).  They point out that Plaintiff did not have the sikha during his incarceration from 1999 through early 2006 yet he was able to exercise his religion (<u>id.</u> at 3).

As to the RLUIPA claim in Count II, Defendants argue that there is no evidence that a sikha hairstyle is *mandated* by Plaintiff's religious beliefs; thus, denial of the hairstyle is not a substantial burden under RLUIPA (<u>id.</u> at 4-5).  They contend that under Ninth Circuit precedent, the RLUIPA analysis requires that the courts consider whether particular religious conduct is mandated (<u>id.</u> at 4).  Defendants further argue that Plaintiff presents no argument or evidence that would support summary judgment on Counts I and II (<u>id.</u> at 5).

---

[4] In a footnote, Defendants state that Plaintiff's motion should be denied because he failed to submit supporting documents or affidavits with his motion as required under the Local Rules of Civil Procedure (Doc. #197 at 3 n. 4).  But in his motion (and in his opposition to Defendants' motion), Plaintiff incorporates evidence already on the record (<u>see</u> Doc.#189, 203).  Nonetheless, despite any procedural deficiencies, the Court will consider Plaintiff's summary judgment motion.

1    In his reply, Plaintiff asserts that he is still receiving a diet that violates his religious

2    dietary laws (Doc. #200).  He also disputes that he ever declared himself Catholic or any

3    other religion besides Hare Krishna (id. at 3-4).  Finally, he requests that the Court dismiss

4    Count III—the religious services claim—because he is "having trouble in getting visits" (id.

5    at 3).[5]

6    ### D.   Defendants' Second Motion for Summary Judgment

7    Defendants move for summary judgment on the remaining claims in Count I (First

8    Amendment claim, Fourteenth Amendment claim, and RLUIPA claim for declaratory and

9    injunctive relief) and Count III (First Amendment claim and Fourteenth Amendment claim)

10   (Doc. #194).

11   Defendants argue on Count I that Plaintiff's inconsistent claims concerning both his

12   religious affiliation and his religious diet requests suggest that his Hare Krishna beliefs are

13   neither authentic nor truly held (Doc. #194 at 16-18).  They further argue that even if an

14   authentic religious request was at issue, the diet provided to Plaintiff does not pose a

15   substantial burden on his free exercise of religion (id. at 17).  Finally, Defendants contend

16   that, assuming there is a substantial burden, there is a compelling governmental interest under

17   RLUIPA not to serve Plaintiff the individualized meal he requests; namely, insufficient

18   resources and security concerns (id. at 18-20).

19   With regard to the First Amendment claim in Count I, Defendants submit that (1)

20   there is a logical connection between the regulation and the legitimate governmental interest,

21   (2) Plaintiff has alterative means to practice his religion, (3) the accommodation would have

22   a significant adverse impact on others and prison resources, and (4) no alternatives exist (id.

23   at 21-23).

24   And as to the Fourteenth Amendment equal protection claim, Defendants argue that

25   Plaintiff has not shown that any other inmate or small group of inmates receive customized

26   religious meals; thus, his discrimination claim fails (id. at 24).

27

28        [5]Apparently, Plaintiff has communicated with Linderman, the ADC Administrator of Pastoral Activities, about this religious services/visitation issue (Doc. #200 at 3).

On Count III, Defendants maintain that for a colorable First Amendment claim, there must be a policy or practice that affects Plaintiff's religious exercise (id. at 24). They argue that there is no such policy; rather, ADC policy provides for religious visitations and prison officials took many steps to accommodate a religious visit requested by Plaintiff (id.).

In response to the Count I arguments, Plaintiff disputes whether Defendants' claims regarding the additional personnel and security needed to bring in outside food are accurate; he asserts that no x-rays or drug-sniffing dogs are used to inspect the food coming in from the current contracted provider (Doc. #203). Plaintiff contends that Defendants' assertion that the Temple preparing a Hare Krishna diet could place drugs or contraband within the meals is unreasonable and libelous (id. at 7). He argues that such a defamatory assertion by defense counsel is both disrespectful and unprofessional, and he asks that the Court sanction counsel (id. at 8).[6] And with respect to his inconsistent diet requests, Plaintiff clarifies that after filing this suit, he learned of the kosher vegetarian diet and believes that this diet—with a few items removed—would meet his religious needs. He states that he therefore tried to work out a compromise with Defendants and counsel to resolve the diet issue (id. at 9).

Although Defendants did not address Count II in their summary judgment motion, Plaintiff argues that he has a sincerely held belief in the Hare Krishna faith and the sikha hairstyle (Doc. #203 at 2-3). He explains that up until 2006, he practiced his faith without the sikha because he was not preparing to be a monk but now he apparently is and that preparation calls for a celibate student life and a sikha hairstyle as a sign of renunciation and surrender (id. at 2, 5). He also states that Hindu and Hare Krishna are "one of the same,"[7] but regardless, even if he was previously a different religion, he now holds a sincere belief in the Hare Krishna faith and makes his religious requests pursuant to his beliefs (id. 5).

---

[6] To the extent that Plaintiff moves for sanctions (Doc. #203 at 8), his request is denied.

[7] In his First Amended Complaint, Plaintiff referred to his religion as "Hare Krishna/Hindu" (Doc. #7 at 4).

1  Plaintiff explains that he did not respond to Defendants' arguments pertaining to

2  Count III because he seeks to dismiss that count (id. at 8).

3  Defendants did not file a reply memorandum.

4  **II.   Voluntary Dismissal**

5  Plaintiff seeks to voluntarily dismiss Count III of his Amended Complaint (Doc. #200

6  at 3-4).  Defendants do not object to this request.  Count III will therefore be dismissed in its

7  entirety with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2), as the parties

8  have litigated this claim on the merits before Plaintiff elected to dismiss it.

9  Consequently, the summary judgment analysis will address only the claims in Counts

10  I and II.

11  **III.   Legal Standards**

12  **A.   Summary Judgment**

13  A court must grant summary judgment "if the pleadings, the discovery and disclosure

14  materials on file, and any affidavits show that there is no genuine issue as to any material fact

15  and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see

16  also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment

17  practice, the moving party bears the initial responsibility of presenting the basis for its motion

18  and identifying those portions of the record, together with affidavits, that it believes

19  demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323;

20  Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

21  If the moving party meets its burden with a properly supported motion, the burden

22  then shifts to the opposing party to present specific facts that show there is a genuine issue

23  for trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995);

24  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Conclusory allegations,

25  unsupported by factual material, are insufficient to defeat a motion for summary judgment.

26  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposing party must, by

27  affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a

28  genuine issue for trial.  Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076.  The

1   opposing party need not establish a material issue of fact conclusively in its favor; it is

2   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

3   parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv.

4   Co., 391 U.S. 253, 288-89 (1968).

5       In assessing whether a party has met its burden, the court views the evidence in the

6   light most favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052,

7   1056 (9th Cir. 1995). All reasonable inferences are drawn in favor of the nonmovant.

8   Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002). On cross-motions for

9   summary judgment, the court must consider each motion separately to determine whether

10  either party has met its burden with the facts construed in the light most favorable to the

11  non-moving party. Fed. R. Civ. P. 56; Fair Hous. Council of Riverside County, Inc. v.

12  Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).

13      **B.   RLUIPA**

14      RLUIPA provides in relevant part that "[n]o government shall impose a substantial

15  burden on the religious exercise of a person residing in or confined to an institution . . . , even

16  if the burden results from a rule of general applicability," unless the government establishes

17  that the burden furthers "a compelling governmental interest" and does so by the "least

18  restrictive means." 42 U.S.C. § 2000cc-1(a)(1)(2). The Ninth Circuit has stated that a

19  substantial burden is one that is "'oppressive' to a 'significantly great' extent. That is, a

20  'substantial burden' on 'religious exercise' must impose a significantly great restriction or

21  onus upon such exercise." Warsoldier, 418 F.3d at 995 (citation omitted). The burden need

22  not concern a religious practice that is compelled by, or central to, a system of religious

23  belief. 42 U.S.C. § 2000cc-5(7)(A). But the burden must be more than an inconvenience;

24  it must prevent the plaintiff "from engaging in [religious] conduct or having a religious

25  experience." Navajo Nation v. United States Forest Service, 479 F.3d 1024, 1042 (9th Cir.

26  2007) (internal citations omitted).

27      Under RLUIPA, the plaintiff bears the initial burden of demonstrating a *prima facie*

28  claim that the challenged state action constitutes a "substantial burden" on his "religious

1   exercise." <u>Warsoldier</u>, 418 F.3d at 994; <u>see also</u> <u>Navajo Nation</u>, 479 F.3d at 1033.  Once the

2   plaintiff establishes a substantial burden, the defendants must prove that the burden both

3   furthers a compelling governmental interest and is the least restrictive means of achieving

4   that interest.  <u>Warsoldier</u>, 418 F.3d at 995.  RLUIPA is to be construed broadly in favor of

5   the inmate.  <u>See</u> 42 U.S.C. § 2000cc-3(g).  At the same time, RLUIPA is to be applied with

6   due deference to prison officials and their need to maintain order and security.  <u>Cutter v.</u>

7   <u>Wilkinson</u>, 544 U.S. 709, 723 (2005).  Any accommodation "must be measured so that it

8   does not override other significant interests."  <u>Id.</u> at 722.

9        **C.    First Amendment**

10       The First Amendment provides that the government shall not prohibit the free exercise

11  of religion.  U.S. Const. amend. I.  This right applies to prisoners, who must be afforded

12  reasonable opportunities to exercise their religious freedom.  <u>Cruz. v. Beto</u>, 405 U.S. 319,

13  322 n. 2 (1972).  For example, prisoners have a right to be provided with food sufficient to

14  sustain them in good health and that satisfies the dietary laws of their religion. <u>See</u> <u>McElyea</u>

15  <u>v. Babbit</u>, 833 F.2d 196, 198 (9th Cir. 1987) (per curiam).  But free exercise rights are limited

16  due to the fact of incarceration and for security reasons.  <u>Id.</u> at 197.  Thus, the penological

17  interest in a simplified food service has been held sufficient to allow a prison to provide

18  Orthodox Jewish inmates with a pork-free diet instead of a completely kosher diet. <u>See</u> <u>Ward</u>

19  <u>v. Walsh</u>, 1 F.3d 873, 877-79 (9th Cir. 1993).

20       To show a violation under the First Amendment, a plaintiff must demonstrate that a

21  prison regulation that impinges on his religious exercise is not reasonably related to a

22  legitimate penological interest.  <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).   That

23  demonstration requires consideration of the four <u>Turner</u> factors: (1) whether there is a "valid

24  rational connection" between the regulation and the legitimate governmental interest put

25  forward to justify it; (2) whether alternative means of exercising the right remain open to the

26  prisoner; (3) the impact the accommodation of the asserted right will have on guards, other

27

28

1    inmates, and the allocation of prison resources generally; and (4) whether there are ready

2    alternatives.   Id. at 89-90.   The absence of ready alternatives is evidence of the

3    reasonableness of a prison regulation. Id. at 90.

4        **D.   Fourteenth Amendment**

5        The Fourteenth Amendment Equal Protection Clause requires the State to treat all

6    similarly situated people equally and entitles each prisoner to "a reasonable opportunity of

7    pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to

8    conventional religious precepts." Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008)

9    (internal citation omitted). To show a violation under the Equal Protection Clause, a plaintiff

10   must demonstrate that the defendant acted with a discriminatory intent or purpose that was

11   based upon the plaintiff's membership in a protected class. Serrano v. Francis, 345 F.3d

12   1071, 1082 (9th Cir. 2003). He "'must set forth specific facts showing that there is a genuine

13   issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared

14   to prisoners of other faiths" and that "officials intentionally acted in a discriminatory

15   manner." Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), abrogated on other grounds

16   by Shakur, 514 F.3d at 884-85. Taking from the Turner test set forth above, the Court must

17   consider whether "the difference between the defendants' treatment of [Plaintiff] and their

18   treatment of [other] inmates is 'reasonably related to legitimate penological interests.'"

19   Shakur, 514 F.3d at 891 (citing DeHart v. Horn, 227 F.3d 47, 61 (3rd Cir. 2000)).

20   **IV.   Count I—Religious Diet**

21       **A.   RLUIPA Claim**

22       **1.   Parties' Contentions**

23       Defendants assert that the lacto-vegetarian diet provided to Plaintiff has not changed

24   since 1999; thus, there is no evidence that this diet—which did not burden Plaintiff's

25   religious exercise for years—substantially burdens his religious exercise now (Doc. #194 at

26   18). They argue that even assuming that there now exists a substantial burden, the lacto-

27   vegetarian diet is the least restrictive means of furthering a compelling governmental interest

28   given the cost of providing the customized diet Plaintiff requests (id.).

1    In support, Defendants proffer the declaration of Malinda L. Strom, the Contracts

2    Monitor for the ADC Commissary/Food Division (Doc. #195, Ex. B, Strom Decl. ¶ 1).

3    Strom avers that regular and lacto-vegetarian meals cost $1.34 per inmate and kosher meals

4    cost $2.26 per inmate (id. ¶¶ 4-5).  To compare these prices to the price of the meals Plaintiff

5    requests, Defendants submit the declaration of Sharon Cooksey, President of the Tucson

6    Temple for the International Society for Krishna Consciousness (ISKCON), which is the

7    Temple Plaintiff identifies and the only in-state facility that can provide customized meals

8    according to Hare Krishna diet requirements (id., Ex. N, Cooksey Decl. ¶ 3).  According to

9    Cooksey, the restaurant at the Temple would be able to prepare lunch and dinner meals for

10   the prison at a cost of $6.00 per meal, not including a beverage (id. ¶ 7).  Cooksey states that

11   the restaurant does not have the ability to deliver meals; they would have to be picked up by

12   ADC on a weekly basis (id. ¶ 9).

13   In addition to the added meal costs, Defendants contend that ADC policy does not

14   permit inmates to purchase food from outside sources due to security concerns (Doc. #194

15   at 20).  Starlet Whitney, the Chief of Security at Eyman Complex, avers that there is a risk

16   that outside food may be shipped with contraband or drugs (Doc. #195, Ex. O, Whitney Decl.

17   ¶¶ 3-6).  She explains that this risk increases when the outside food is shipped for receipt by

18   a specific inmate; it would require that each meal be individually inspected by use of x-rays

19   and drug-sniffing dogs (id. ¶¶ 7-8, 10(a)).  Whitney explains that this same risk does not arise

20   with the current ADC food-vendor meals because those meals are delivered sealed and are

21   not provided to a specific inmate (id. ¶ 8).  And she notes that any outside food delivery

22   would require additional personnel to transport and inspect the meals (id. ¶ 9).  This would

23   subject ADC to additional costs for employees, gas, and a vehicle equipped with a

24   freezer/refrigerator unit to make the 130-mile round trip between the Eyman Complex and

25   the ISKCON Temple every week (id. ¶ 10(a-b)).

26   Lastly, Defendants submit that short of expending these considerable resources, there

27   exists no less restrictive means for accommodating Plaintiff's religious meal request (Doc.

28   #194 at 21).  They conclude that these financial and administrative burdens, along with the

1   security concerns, evince a compelling state interest in not providing the specialized Hare

2   Krishna meal plan.

3         Plaintiff rejects Defendants' claims that additional personnel and security would be

4   necessary or that there is a risk of contraband in the meals prepared by the Temple (Doc.

5   #203).  He suggests that the current food vendor, Canteen Corporation, could deliver his

6   meals because they work with an ADC facility near Tucson (id. at 7).  Plaintiff also argues

7   that Whitney's declaration fails to address how the overall prison inmate population would

8   be affected (id. at 8).  And he contends that Defendants do not address "the issue of the

9   forbid[d]en food of onions, garlic, vinegar salad dressing, caffeine" that are included in the

10  lacto-vegetarian diet (Doc. #200 at 3).

11        **2.    Analysis**

12              ***a.  Substantial Burden***

13        Plaintiff bears the initial burden of producing evidence to demonstrate a *prima*

14  *facie* claim that Defendants' refusal to provide him with meals that are prepared according

15  to the Hare Krishna dietary laws amounts to a substantial burden on his religious exercise.

16  See 42 U.S.C. § 2000cc-2(b).

17        As Defendants point out, Plaintiff's recent claim that the lacto-vegetarian diet burdens

18  his religious practice appears insincere given his acceptance of that diet from 1999 until the

19  events giving rise to this suit in 2005.  But in his opposition to Defendants' motion, Plaintiff

20  indicates that he is becoming more serious in his religious studies and training as a monk

21  (Doc. #203 at 2, 5).  More serious religious studies can enlighten a follower to certain

22  religious practices that he may have previously been unfamiliar with.

23        Regardless, the Court already found that (1) Plaintiff demonstrated a sincere belief

24  that eating food prepared by a member of his religion is consistent with his faith and (2) that

25  the current lacto-vegetarian diet included food items that violate Plaintiff's religious dietary

26  laws (Doc. #185 at 9).  Requiring Plaintiff to eat food that is prohibited by his religion's

27

28

1   dietary regimen may constitute a substantial burden on his religious practice.  See Ward, 1

2   F.3d at 878-79.   Defendants present nothing that causes the Court to alter its prior

3   determination that there is a substantial burden on Plaintiff's religious exercise.

4               **b.  Compelling Governmental Interest/Least Restrictive Means**

5           The burden shifts to Defendants to show that the current provision of the lacto-

6   vegetarian diet is the least restrictive means of furthering a compelling governmental interest.

7   When applying this compelling governmental interest standard, "context matters."  Cutter,

8   544 U.S. at 723.  Here, context includes consideration of (1) the available resources and (2)

9   the regulations and procedures necessary to facilitate feeding large numbers of prisoners

10  while maintaining security and discipline.  See id.

11          Defendants' evidence includes declarations from the ADC Food Division Contracts

12  Manager and the President of the ISKCON Temple that show a substantial cost difference

13  between the meals currently provided to prisoners and the meals that Plaintiff desires (Doc.

14  #195, Ex. B, Strom Decl.; Ex. N, Cooksey Decl.).  The difference—$2.26 versus $6.00 per

15  meal[8]—would amount to $2,730 added cost per year and over $100,000 added cost for the

16  next 40 years (Doc. #194 at 20).[9]  This does not even include the accompanying expenses for

17  gas, transportation, delivery, inspection, and extra personnel for these duties (Doc. #195, Ex.

18  N, Cooksey Decl. ¶ 9; Ex. O, Whitney Decl. ¶¶ 8-10(a-b)).  And the Court cannot discount

19  the security concerns raised by a single prisoner receiving individually prepared meals from

20  an outside source 65 miles from his prison facility.  While there is a risk of contraband being

21  added to these meals during preparation, the risk is greater during delivery, arrival, and

22  storage at the prison.  As explained by Whitney, all other meals provided to prisoners arrive

23  sealed and are distributed among 5 different prison units (id., Whitney Decl. ¶¶ 7-8).

24

25  _____

26      [8] For comparison purposes, this analysis applies the price of the more expensive prison
    meal provided to inmates (see Doc. #195, Ex. B, Strom Decl. ¶ 4 (regular meal price is $1.34
27  and kosher meal price is $2.26)).

28      [9] Defendants note that Plaintiff, who is 42 years old, is serving a sentence set to expire
    in 2092 (Doc. #194 at 20).

1    Religious accommodations should not override a prison's significant interests in

2    maintaining order and security consistent with the available resources. See Cutter, 544 U.S.

3    at 722. If an inmate's request for an accommodation is excessive or jeopardizes the effective

4    functioning of the prison, the accommodation need not be met. Id. at 726. The evidence

5    demonstrates that there would be significant financial, administrative, and security effects

6    on the prison if it were required to provide Plaintiff specially prepared Hare Krishna meals

7    from the ISKCON Temple. Thus, Defendants have met their burden to set forth specific

8    facts and evidence showing that in this case, providing Plaintiff with customized religious

9    meals would adversely impact prison operations. See Warsoldier, 418 F.3d at 1000 ("prison

10   officials must set forth detailed evidence, tailored to the situation, . . . that identifies the

11   failings in the alternatives advanced by the prisoner") (citation omitted). Further, because

12   Plaintiff specifically seeks a diet prepared by Hare Krishna devotees, which encompasses the

13   associated costs, there is no less restrictive means available to meet his request for a special

14   diet.

15       Plaintiff's assertions that there would be no added costs or security concerns are not

16   supported by any specific facts or evidence. As such, Plaintiff's request for summary

17   judgment on this claim will be denied. Conclusory allegations, unsupported by factual

18   material, are also insufficient to defeat a motion for summary judgment. Taylor v. List, 880

19   F.2d 1040, 1045 (9th Cir. 1989). When construing the facts in Plaintiff's favor, he fails to

20   show that there is a genuine issue for trial. Anderson, 477 U.S. at 249. Summary judgment

21   will be granted to Defendants on the RLUIPA claim for declaratory and injunctive relief in

22   Count I.

23       **B.    First Amendment Claim**

24       As stated, to prevail on his First Amendment free exercise claim Plaintiff must show

25   that Defendants' meal policy, which does not provide specialized Hare Krishna meals, is not

26   *reasonably* related to a legitimate penological interest. Turner, 482 U.S. at 89. The Court

27   has found that Defendants' denial of customized Hare Krishna meals serves a *compelling*

28   governmental interest and that there is no less restrictive means of accommodating Plaintiff's

1  request.  Because Defendants have satisfied the more stringent test under RLUIPA, they are

2  entitled to summary judgment on Plaintiff's First Amendment claim within Count I.

3        **C.**    **Fourteenth Amendment Claim**

4        To succeed in his equal protection claim, Plaintiff must show that officials

5  intentionally acted in a discriminatory manner; he must set forth specific facts showing there

6  is genuine issue whether Defendants denied him a reasonable opportunity to pursue his faith

7  as compared to other prisoners and that Defendants' conduct was intentional.  Freeman, 125

8  F.3d at 737.  Conclusory allegations by themselves do not establish an equal protection

9  violation without further proof of invidious discriminatory intent.  See Village of Arlington

10 Heights v. Metropolitan Hous Dev. Corp., 429 U.S. 252, 265 (1977).

11       Defendants contend that Plaintiff has not shown (1) what religious group is receiving

12 different treatment, (2) that any other single prisoner or groups of prisoners receive

13 customized religious meals, or (3) that the denial of a Hare Krishna customized meal plan

14 is not reasonably related to legitimate penological interests (Doc. #194 at 23-24).

15       Although Plaintiff specifically refers to an Orthodox Jewish inmate who is treated

16 differently with respect to the prison grooming policy (Doc. #189 at 2), nowhere in his

17 summary judgment briefing does he mention that another prisoner or religious group is

18 treated differently concerning religious meals (see Docs. #189, 200, 203).  The only reference

19 to another religious group is in his First Amended Complaint where he alleged that he was

20 given a lacto-vegetarian Sikhs' diet, rather than a diet tailored to the Hare Krishna faith (Doc.

21 #7 at 4-5).

22       Defendants' evidence includes excerpts from the ADC Diet Reference Manual, which

23 describes the religious diets available to prisoners (Doc. #195, Ex. F at 34).  None of the

24 these diets are religion specific (id.).  Thus, there is no separate diet prepared specifically for

25 Sikhs or any other religion.  Defendants demonstrate that there are approximately 57

26 different religious affiliations represented in the prison system (id., Ex. A, Linderman Decl.

27 ¶ 17).  Given the number of different religions, customized meals for individual religious

28 groups are not feasible (id.).  As a result, religious diet requests are generally limited to those

1  set out in the Diet Reference Manual (Ex. F at 14 ("[o]nly the approved list of religious diet

2  menus will be assigned unless otherwise approved by the Director of Pastoral Services")).

3          In addition, Defendants have shown that there are compelling reasons for denying

4  Plaintiff a customized Hare Krishna diet.  Plaintiff cannot succeed on this claim because any

5  difference between Defendants' treatment of him and their treatment of Sikhs (or another

6  religious group) is "reasonably related to legitimate penological interests." Shakur, 514 F.3d

7  at 891 (internal citation omitted).

8          Plaintiff's conclusory allegations that Sikhs are provided customized diets and he is

9  not is insufficient to establish an equal protection violation.  He submits no other specific

10 facts or evidence that suggests discriminatory intent on the part of Defendants.  As such, the

11 Court will grant summary judgment to Defendants on the equal protection claim in Count I.

12         In light of the Court's determination that Defendants are entitled to summary

13 judgment on the RLUIPA claim, the First Amendment claim, and the Fourteenth Amendment

14 claim in Count I, Defendants' motion will be granted on Count I, and Plaintiff's motion will

15 be denied on this count.

16 **V.     Count II—Religious Hair Style**

17        **A.     RLUIPA Claim**

18         Defendants argue that there is no evidence that the sikha hairstyle is "conduct

19 mandated by religious belief" (Doc. #197 at 4).  They point to Plaintiff's previous

20 contentions that the hairstyle may be worn "whenever practical," which demonstrates that

21 it is not mandatory (id.).  And because it is not mandated conduct, the denial of this hairstyle

22 does not rise to a substantial burden (id. at 5).  Defendants acknowledge that in Shakur, the

23 Ninth Circuit found that a First Amendment claim need not examine whether conduct is

24 *mandated*; however, they contend that this requirement has not been removed from the

25 RLUIPA analysis.

26         In fact, the Ninth Circuit has found that "conduct mandated by religious belief" is

27 defined within the statute by the term "religious exercise," and that definition is "any exercise

28 of religion, *whether or not compelled by*, or central to, a system of religious belief." Alvarez

1   v. Hill, 518 F.3d 1152, 1156 (9th Cir. 2008) (emphasis in original) (citing 42 U.S.C.

2   § 2000cc-5(7)(A)).  Plaintiff explains that he is moving towards training as a monk and

3   wearing the sikha is an important sign of renunciation and "surrender to Krishna" (Doc. #203

4   at 2, 5).  Thus, even though the sikha hairstyle may not be required by the Hare Krishna faith,

5   it does constitute an exercise of religion within Plaintiff's system of religious belief.  The

6   Court finds that wearing the sikha is "religious exercise" as defined by RLUIPA.

7           A grooming policy that either requires a prisoner to abandon his religious beliefs by

8   cutting his hair or puts significant pressure on him to do so, imposes a substantial burden on

9   religious practice.  See Warsoldier, 418 F.3d at 994, 996.  Therefore, Plaintiff has met his

10  burden of showing that Defendants' grooming policy prohibiting his religious hairstyle is a

11  substantial burden on his religious exercise.  The burden shifts to Defendants to prove that

12  the imposition of the substantial burden furthers a compelling interest by the least restrictive

13  means.  42 U.S.C. § 2000cc-2(b).

14          Defendants do not present any argument going to whether there exists a compelling

15  governmental interest.  As a result, they fail to meet their burden and their cross-motion for

16  summary judgment on the RLUIPA claim in Count II will be denied.

17          In his attempt to show that there exists no material fact that Defendants' grooming

18  policy violates his rights under RLUIPA, Plaintiff relies on the Ninth Circuit decision in

19  Warsoldier.  The Native American prisoner-plaintiff in Warsoldier sought to maintain his

20  long hair in keeping with his Cahuilla tribe's cultural and religious tenets.  418 F.3d at 991-

21  92.  The circuit court held that although prison security was a compelling governmental

22  interest, the California Department of Corrections' grooming policy was not the least

23  restrictive means necessary to ensure prison security and that the plaintiff was likely to

24  prevail on the merits of his RLIUPA claim.  Id. at 998, 1002.

25          In his motion, Plaintiff argues that there is no proof of safety or security problems

26  related to his religious hairstyle (Doc. #189 at 1).  He states that he has worn the sikha since

27  October 2006, and has not been threatened by other inmates or subject to dangerous

28  conditions (id. at 1-2).  In response to earlier claims by Defendants that Plaintiff's hairstyle

1    would make him a target for gang members, Plaintiff asserts that gang activity is not an issue

2    in his housing unit.  He also states that he was housed in the county jail during June 2007,

3    and despite his hairstyle and the known gang activity in the jails, he did not experience any

4    problems (id. at 1).  Finally, Plaintiff recites the ADC grooming policy in his opposition to

5    Defendants' motion; it reflects that a variety of hairstyles are allowed (Doc. #203 at 4-5).

6         As stated, Defendants did not raise a compelling governmental interest or least

7    restrictive means argument, and they did not respond to Plaintiff's claims that his hairstyle

8    did not present a security concern (see Doc. #197).  On this record, Plaintiff has met his

9    burden to show no material fact that the grooming policy prohibiting his religious hairstyle

10   substantially burdens his religious exercise, that there are no compelling interests that justify

11   the prohibition, and that there are no less restrictive alternatives.  The Court will grant

12   Plaintiff summary judgment on his RLUIPA claim for declaratory and injunctive relief in

13   Count II.  The injunction issued on October 5, 2006, will be made permanent.

14        **B.     First Amendment Claim**

15        **1.     Sincere Belief**

16        As stated, to establish a First Amendment free exercise violation, Plaintiff must show

17   that the religious practice at issue satisfies two criteria: (1) the "proffered belief must be

18   sincerely held" and (2) "the claim must be rooted in religious belief, not in 'purely secular'

19   philosophical concerns."   Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994) (internal

20   citations omitted); Shakur, 514 F.3d at 885.

21        Defendants argue that Plaintiff fails to establish that he has a sincerely held belief that

22   a sikha hairstyle is consistent with his faith (Doc. #197 at 2).  See Malik, 16 F.3d at 333.

23   They point out that Plaintiff successfully exercised his religion for years without this

24   religious hairstyle (id. at 3).  Thus, they maintain that because he has not specifically stated

25   that he believes a sikha is "necessary for him to practice his religion," he does not meet the

26   threshold burden for a free exercise claim (id. at 3-4).

27

28

As mentioned above, Plaintiff indicates his present desire to enter into Hare Krishna monkhood, which calls for more intense religious practice, and he explains the purpose of wearing a sikha (Doc. #203 at 2, 5).

The Ninth Circuit has explained that "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" Shakur, 514 F.3d at 884 (quoting Hernandez v. C.I.R., 490 U.S. 680, 699 (1989)).  Instead, a court must apply a subjective or "sincerity test"—if the prisoner has a "sincerely held" belief that is consistent with his faith and "rooted in religious belief," the Free Exercise Clause is implicated.  Shakur, 514 F.3d at 884-85 (internal citations omitted).  The constitutional guarantee of free exercise of religion "is not limited to beliefs which are shared by all of the members of a religious sect."  Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 715-16 (1981).

The Court previously found that Plaintiff met his burden to show that the policy forbidding him to wear a religious hairstyle was a substantial burden on his free exercise rights (Doc. #97 at 9).  Nothing in the record suggests that Plaintiff's beliefs have changed or are not "sincerely held."  The fact that Plaintiff did not wear the hairstyle for years does not undermine his claim that his present belief in its importance is sincere; he was forbidden from wearing the sikha for those years, and when he did try to wear it in 2006, he was forced to shave it off after two months (Doc. #197 at 3).  The Court again finds that Plaintiff has a sincere belief that he should wear a sikha; therefore, Defendants' grooming policy prohibiting it implicates the First Amendment.

### 2.   **Turner Factors**

Next, the Court must apply the four Turner factors to determine whether there is a genuine issue of material fact with respect to Plaintiff's claim.  See Shakur, 514 F.3d at 885. The first factor looks at whether there is a legitimate penological interest that is rationally related to the grooming policy.  Turner, 482 U.S. at 89-90.  Plaintiff argues that his experience wearing the sikha for the past 18 months—namely, no threats or danger from gangs or any other inmates—demonstrates that there is no security or safety reason for the

1  prohibition of the sikha (Doc. #189).  He also argues that there is no evidence that wearing

2  his hairstyle has prompted any other requests for religious hairstyles or encouraged any

3  lawsuits about religious hairstyles (id. at 1-2).  Defendants do not rebut these arguments nor

4  do they present a legitimate penological interest supporting the grooming policy (see Doc.

5  #197 at 2-4).  Thus, the first factor weighs in Plaintiff's favor.

6        The second factor concerns whether there are alternative ways for Plaintiff to exercise

7  the right on which the policy impinges.  Turner, 482 U.S. at 90.  Plaintiff implies that the

8  purposes of wearing the sikha—to show renunciation and surrender to Krishna and for

9  cleanliness and simplicity—are unique compared to other types of religious practice (Doc.

10  #203 at 5).  Defendants proffer no potential alternative for Plaintiff to exercise this right.  The

11  second factor weighs in Plaintiff's favor.

12        In failing to rebut Plaintiff's assertions about the lack of security problems or any

13  other hairstyle requests or lawsuits, there is no evidence that allowing the sikha would

14  adversely impact guards, other inmates, or prison resources.  Turner, 482 U.S. at 90.

15  Consequently, the third Turner factors weighs in Plaintiff's favor.

16        The final factor looks at whether there are ready alternatives to Defendants' current

17  grooming policy.  Id.  Plaintiff sets forth the current ADC grooming policy, which provides

18  for a variety of hairstyles and head gear to be worn be by prisoners (Doc. #203 at 4-5).  The

19  policy is not so strict that a sikha hairstyle could not be an alternative.  Plaintiff also argues,

20  and Defendants do not dispute, that another inmate has been granted an exemption from the

21  policy; therefore, alternatives to the policy appear to exist.  On this record, the fourth factor

22  also weighs in Plaintiff's favor.

23        For the purposes of Defendants' cross-motion (Doc. #197), construing the allegations

24  in Plaintiff's favor, a reasonable jury could find that Defendants' policy prohibiting the sikha

25  hairstyle violates  Plaintiff's First Amendment rights.

26        **3.      Qualified Immunity**

27        But this determination does not end the inquiry on the First Amendment claim.  In

28  both their Answer and their first Motion for Summary Judgment, Defendants raise the

affirmative defense of qualified immunity (Docs. #32, 158).  Qualified immunity should be

addressed as early as possible in litigation.  Hunter v. Bryant, 502 U.S. 224, 227 (1991).  The

Court will therefore examine the issue of qualified immunity as applied to Plaintiff's free

exercise claim in Count II.  See  Graves v. City of Coeur D'Alene, 339 F.3d 828, 845-46 n.

23 (9th Cir. 2003) (addressing qualified immunity issue sua sponte because the defendants

asserted the defense in their answer), abrogated on other grounds by U.S. v. Lopez, 482 F.3d

1067 (9th Cir. 2007); Sonoda v. Cabrera, 255 F.3d 1035, 1040 n. 2 (9th Cir. 2001)

(reviewing a district court's sua sponte grant of qualified immunity where the defendants

raised a qualified immunity defense in their answer).

A defendant in a § 1983 action is entitled to qualified immunity from damages for

civil liability if his conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800,

818 (1982).  In a qualified immunity analysis, the court must make two distinct inquires, the

"constitutional inquiry" and the "qualified immunity inquiry."   See Estate of Ford v.

Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  The "constitutional inquiry" asks

whether, when taken in the light most favorable to the non-moving party, the facts alleged

show that the official's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S.

194, 201 (2001).  If so, a court turns to the "qualified immunity inquiry" and asks if the right

was clearly established at the relevant time.  Id. at 201-02.  This second inquiry "must be

undertaken in light of the specific context of the case, not as a broad general proposition."

Id. at 201.

As discussed *supra*, the Court has determined that the disputed facts, viewed in the

light most favorable to Plaintiff, create a triable issue of fact regarding whether Defendants

violated Plaintiff's First Amendment rights in Count II.  The second step of the Saucier

analysis looks at whether the right to a sikha religious hairstyle was clearly established

statutory law.  A right is clearly established if its contours are "sufficiently clear that a

reasonable official would understand that what he is doing violates that right."  Kennedy v.

City of Ridgefield, 439 F.3d 1055, 1065 (9th Cir. 2006) (quoting Hope v. Pelzer, 536 U.S.

730, 739 (2002)).  It is not necessary that there be a prior case with the identical facts showing that a right is clearly established; it is enough that there is preexisting law that provides a defendant "fair warning" that his conduct was unlawful.  <u>Kennedy</u>, 439 F.3d at 1065.

Plaintiff initiated this lawsuit in July 2005 (Doc. #1).  The year before, the Ninth Circuit upheld a California prison grooming policy against a First Amendment challenge; the policy prohibited male inmates from wearing long hair and made no religious exceptions.  <u>Henderson v. Terhune</u>, 379 F.3d 709, 711, 715-16 (9th Cir. 2004).  This decision was consistent with other circuit court holdings at the time.  <u>Taylor v. Johnson</u>, 257 F.3d 470, 472-73 (5th Cir. 2001) (failure to make a religious exception to the prison grooming policy did not violate inmate's free exercise rights); <u>Hines v. South Carolina Dep't of Corrs.</u>, 148 F.3d 353, 357-59 (4th Cir. 1998) (finding that prison grooming policy did not violate First Amendment free exercise clause despite the claimed incidental effect on some inmates' religious practice).  In 2001, the Sixth Circuit found that a prisoner's First Amendment right to wear a Hasidic Jewish hairstyle was not sufficiently clear; thus, prison officials were granted summary judgment on qualified immunity grounds.  <u>Flagner v. Wilkinson</u>, 241 F.3d 475, 483 (6th Cir. 2001).  Little other precedent, particularly within the Ninth Circuit, was available during the relevant time to provide Defendants guidance on free exercise rights applied to prison grooming policies.

Given the Ninth Circuit's holding in <u>Henderson</u> in 2004 and the lack of any contrary precedent, the Court finds that Defendants would not have had "fair warning" that denying a religious exemption from their grooming policy was unlawful.  Defendants are therefore entitled to qualified immunity on the First Amendment claim in Count II.  Plaintiff's request for summary judgment on this claim will be denied and the claim for damages will be dismissed.

### C.   Fourteenth Amendment Claim

The remaining claim is Plaintiff's Fourteenth Amendment equal protection claim in Count II.  He alleges that an Orthodox Jewish inmate has been exempted from the grooming

policy (Doc. #189 at 2). But Plaintiff does not provide any other facts supporting this claim. Again, conclusory allegations alone do not establish an equal protection violation without further proof of invidious discriminatory intent. See Village of Arlington Heights, 429 U.S. at 265. Plaintiff presents no argument regarding discrimination and he fails to present any specific facts suggesting that Defendants acted with discriminatory intent or purpose that stemmed from Plaintiff's religion. Serrano, 345 F.3d at 1082. Accepting all Plaintiff's allegations as true, he cannot prove any set of facts that would entitle him to relief on his equal protection claim. Consequently, Plaintiff's request for summary judgment on this claim will be denied. And because there exists no genuine issue of material fact whether Defendants' violated Plaintiff's equal protection rights in Count II, Defendants will be granted summary judgment on this claim.

**IT IS THEREFORE ORDERED:**

(1) Plaintiff's request to dismiss Count III (within Doc. #200) is **granted** and Count III is dismissed with prejudice.

(2) Plaintiff's Motion for Summary Judgment (Doc. #189) is **granted** in part and **denied** in part as follows:

       (a) the motion is granted as to the RLUIPA claim for injunctive relief in Count II; declaratory relief is unnecessary in light of the grant of injunctive relief;

       (b) the motion is otherwise denied.

(3) Defendants' Motion for Summary Judgment (Doc. #194) is **granted** in part and **denied** in part as follows:

       (a) the motion is granted as to all claims in Count I;

       (b) the motion is denied as moot with respect to Count III.

(4) Defendants' Cross-Motion for Summary Judgment (Doc. #197) is **granted** in part and **denied** in part as follows:

       (a) the cross-motion is granted on qualified immunity grounds for the First Amendment claim in Count II;

(b) the cross-motion is granted as to the Fourteenth Amendment claim in Count II;

(c) the cross-motion is otherwise denied.

(5) Defendants are permanently enjoined as follows:

(a) Defendants may not prohibit Plaintiff from wearing the sikha hairstyle.

(b) Defendants may not impose any form of discipline on Plaintiff for wearing the sikha for religious purposes.

(c) this relief extends no further than necessary to correct the threat to Plaintiff's rights under RLUIPA; it is narrowly drawn and the least intrusive means necessary to correct the harm. See 18 U.S.C. § 3626(a)(1).

(6) The Clerk of the Court shall enter judgment as follows:

(a) Judgment is entered in favor of Plaintiff and against Defendants on the RLUIPA claim in Count II; Defendants are permanently enjoined from prohibiting Plaintiff from wearing the sikha hairstyle and from imposing any form of discipline on Plaintiff for wearing the sikha for religious purposes.

(b) Judgment is entered in favor of Defendants on all other claims, and Plaintiff shall take nothing on all other claims in this action.

The Clerk shall terminate this action.

Dated: June 12, 2008.

_____
Neil V. Wake
United States District Judge